UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 24-CV-5665 |
| | ) |
| FUNDS IN THE AMOUNT OF | ) |
| APPROXIMATELY $4,475,064.55 | ) Judge |
| SEIZED FROM WINTRUST BANK | ) |
| ACCOUNT IN THE NAME OF HIMONT | ) |
| LAW GROUP, INC., ACCOUNT | ) |
| NUMBER XXXXXX7888; | ) |
| | ) |
| Defendant. | ) |

## **VERIFIED COMPLAINT FOR FORFEITURE**

The UNITED STATES OF AMERICA, by MORRIS PASQUAL, Acting

United States Attorney for the Northern District of Illinois, for its verified

complaint against the above-named defendant property, alleges in accordance with

Supplemental Rule G(2) of the Federal Rules of Civil Procedure as follows:

### **Nature of the Action**

1.     This is a civil action brought to forfeit property seized by the United

States government for violations of federal law that provide for the seizure,

forfeiture, and disposal of certain property to the United States.

2.     This action is an *in rem* legal proceeding against property, not against

an individual, to determine rights in the property that are conclusive against the

entire world.

3.     This complaint is verified by the attached Verification Karl D. Kraywinkle, Federal Bureau of Investigation ("FBI") Special Agent ("SA Kraywinkle"), which is fully incorporated herein.

## The Defendant *in rem*

4.     The defendant *in rem* consists of the following property:

(a) Funds in the amount of approximately $4,475,064.55 seized from Wintrust Bank account in the name of Himont Law Group, Ltd. with account number XXXXX7888 ("**Wintrust Account**").

5.     The defendant property was seized on or about March 6, 2024.

6.     The defendant property is currently in the custody of the United States Marshals Service.

## Jurisdiction and Venue

7.     This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Sections 1345, and over an action for forfeiture under Title 28, United States Code, Section 1355(a).

8.     This Court has *in rem* jurisdiction over the defendant property pursuant to Title 28, United States Code, Section 1355(b)(1)(A), because acts giving rise to this action occurred within the Northern District of Illinois.

9.     Venue is proper in the Northern District of Illinois pursuant to Title 28, United States Code, Section 1395 because acts giving rise to this action occurred in this district.

## Statutory Basis for Forfeiture

10.     The defendant property is subject to forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 and 1957, or any property traceable to such property. The defendant property is further subject to forfeit pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), as property that constitutes and is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1341, 1343, 1347, and 1349.

## Specific Allegations

### I.     Background

#### A.     Summary

11.     This investigation began in approximately April 2023, when law enforcement agencies detected an extraordinary spike in billing Medicare for delivery of over-the-counter ("OTC") COVID-19 test kits, followed by thousands of complaints from Medicare beneficiaries who did not receive the test kits. The investigation concerns numerous laboratories, including Luna Labs LLC ("Luna Labs") and SK Diagnostics, Inc. ("SK Diagnostics") which submitted claims to Medicare purporting to have delivered such test kits.

12.     In approximately June 2023, law enforcement obtained seizure warrants issued in the Northern District of Illinois for bank accounts associated

with Luna Labs and SK Diagnostics which had received – directly or indirectly – funds paid by Medicare for fraudulent OTC COVID-19 test kit billing.

13.     More specifically, as further described below, bank records and other evidence establish that deposits of $4,500,000 to the **Wintrust Account** – including a transfer of $3,000,000 on or about May 9, 2023, associated with Luna Labs, and a transfer of $1,500,000 on or about May 5, 2023, associated with SK Diagnostics – were derived from fraudulent billing of Medicare for purported delivery OTC COVID-19 test kits, and are traceable to the previously seized Luna Labs and SK Diagnostic accounts.

### B.     The Medicare Program

14.     Medicare is a federal health benefit program administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services. Medicare is funded through individual payroll taxes, other taxes, and user fees. Medicare helps pay for the reasonable and necessary medical services for people aged 65 and older and some persons under 65 with certain illness and/or disabilities. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

15.     Each Medicare beneficiary is identified with a unique beneficiary identifier number ("BIN"). These BINs are used, among other ways, to determine a beneficiary's eligibility for Medicare benefits, and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services.

16.     Medicare, as well as private health care benefit programs are "health care benefit programs" as defined by Title 18, United States Code, Section 24(b), that is, a "public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual…" 18 U.S.C. § 24(b).

17.     Medical providers and suppliers must obtain a National Provider Identifier ("NPI") before enrolling in Medicare. Health care providers seeking to become a Medicare provider must submit enrollment documentation to Medicare, which includes, among other things, contact information for the provider.

18.     Every claim submitted by, or on behalf of, a physician or health care provider, includes an agreement by the provider to abide by Medicare's rules and regulations. As a condition of payment Medicare requires providers to certify all information on the claim is true, correct, and complete. Additionally, the provider certifies the service was rendered personally by the provider or under his/her direct supervision and incident to the provider's care and that the service was medically necessary for the health and/or well-being of the patient. Health care suppliers, like SK Diagnostics and Luna Labs, are paid by Medicare through the submission of claims.  All Medicare providers are required to submit claims electronically. Those claims are processed through Baltimore, Maryland, and therefore they travel in interstate commerce. Medicare reimburses claims electronically, as well, and payments for Medicare Part A services in Illinois are issued from National Government Services, a Medicare Administrative Contractor headquartered in Indianapolis, Indiana. Payments are made into a provider's bank account through

an electronic funds transfer. Providers are also required to maintain all documents that substantiate Medicare claims for at least six years.

### C. Over-the-Counter ("OTC") COVID-19 Test Kits

19. In April 2022, the federal government announced that individuals with Medicare could receive up to eight OTC COVID-19 tests per calendar month from participating pharmacies and health care providers for the duration of the COVID-19 public health emergency ("PHE") at no cost to beneficiaries. The PHE ended on May 11, 2023, at which point Medicare would no longer pay for eight OTC COVID-19 tests per month at no cost to beneficiaries.

20. To receive reimbursement from Medicare for the OTC COVID-19 tests, providers were directed to bill Medicare using Healthcare Common Procedure Code System ("HCPCS") code K1034. CMS's guidance to providers billing for these OTC COVID-19 tests is to "only give patients the tests when they request them." Additionally, CMS instructed providers to "keep good documentation. We may ask to see documentation showing a patients' request for tests. If you don't provide the documentation, we could recoup payment and may take other administrative actions."

## II. Facts Establishing Basis For Forfeiture

### A. SK Diagnostics

21. According to Illinois Secretary of State records, SK Diagnostics Inc. was incorporated on November 23, 2021, and as of October 24, 2022, its President was Syed Hyder Hussain.

6

22.     SK Diagnostics directed Medicare to pay it through deposit of funds into JP Morgan Chase ("JPMC") account xxxxx7210 ("SK Account 1") beginning on approximately February 20, 2023. On March 23, 2023, SK Diagnostic's owner, Syed Hyder Hussain, completed a form authorizing Medicare to make payments to Bank of America account xxxxxxxx4240 ("SK Account 2").  This change became effective April 29, 2023.

23.     SK Account 2 was opened by Syed Hyder Hussain on or about October 26, 2022.

### i.     Medicare claims analysis

24.     Beginning on or about March 30, 2023, despite never having done so before, SK Diagnostics billed Medicare almost exclusively for HCPCS Code K1034 at extraordinarily high rates. As indicated above, this is the billing code applicable for reimbursement of delivery of OTC COVID-19 test kits to Medicare beneficiaries.

25.     SK Diagnostics's billings for HCPCS Code K1034 were submitted to Medicare during a very short period of time and were extraordinarily high.

26.     Between approximately March 30, 2023, and June 5, 2023, a period of just over nine weeks, SK Diagnostics sought payments totaling approximately $93,551,800, and was paid approximately $43,298,839.08, by Medicare. During this time, SK Diagnostics billed Medicare for shipping OTC COVID-19 test kit delivery to approximately 460,845 Medicare beneficiaries.

27.     Medicare claims data also demonstrates an extraordinarily unusual rate of back billing.

7

28.     For example, Medicare received claims from SK Diagnostics on May 9, 2023, and May 10, 2023, for OTC COVID-19 test kits allegedly shipped to Medicare beneficiaries from approximately November through December 2022 in amounts totaling over $46 million for more than 1,800,000 test kits for approximately 232,046 beneficiaries.

29.     Billing Medicare five to six months after the purported date of service for such a large number of beneficiaries is exceedingly uncommon and indicative of fraud.

### ii.     Medicare beneficiary complaints

30.     Since approximately April 2023, shortly after SK Diagnostics began submitting claims to Medicare for HCPCS Code K1034, Medicare beneficiaries have submitted an extraordinary number of complaints to the government relating to SK Diagnostics.

31.     Between approximately April 7, 2023, and November 18, 2023, Medicare received 25,357 complaints from Medicare beneficiaries regarding SK Diagnostics.

32.     Although investigators have not yet interviewed all of the beneficiaries, the complaints have been preliminarily reviewed and categorized by the government.

33.     10,893 of the complaints have been categorized as "Did Not Receive Services," and 727 of the complaints have been categorized as "Suspected Identity Theft."

34.     Law enforcement agents have begun to interview Medicare beneficiaries who have lodged complaints relating to SK Diagnostics.

35.     For example, between approximately May 31, 2023, and June 6, 2023, law enforcement agents interviewed 3 individuals who reported that SK Diagnostics had billed Medicare using his/her name for shipment of OTC COVID-19 test kits that were purportedly delivered to them. All 3 individuals reported to the interviewing agent that they had never received or requested a COVID-19 test kit from SK Diagnostics.

### iii.     Billing for deceased beneficiaries

36.     As of June 2023, SK Diagnostics attempted to bill Medicare for approximately 445 claims for purportedly supplying OTC COVID-19 test kits on a date after the beneficiary's date of death. In other words, the date of service according to the claim submitted by SK Diagnostics, purportedly the date the test kits were sent or delivered, occurred after the reported death of the Medicare beneficiary.

37.     For example, SK Diagnostics submitted a claim under procedure code K1034 with a purported date of service of April 24, 2023, for a test kit allegedly delivered to Medicare beneficiary G.W. According to Medicare data, however, Medicare beneficiary G.W. died on June 6, 2020.

38.     As another example, SK Diagnostics submitted a claim under procedure code K1034 with a purported date of service of April 25, 2023, for a test

kit allegedly delivered to Medicare beneficiary J.S. According to Medicare data, however, Medicare beneficiary J.S. died on March 19, 2019.

39.     Medicare providers who repeatedly bill for services purportedly delivered to dead beneficiaries are often using Medicare beneficiary information that has been purchased or unlawfully transferred, rather than collected in the ordinary course of the provision of bona fide services to beneficiaries.

### iv.     Lack of identifiable business expenses

40.     Based upon review of bank records for SK Diagnostics, outgoing money from SK Diagnostics' accounts did not reflect the extent of business expenses that one would expect for a company that delivered millions of OTC COVID-19 test kits to hundreds of thousands of Medicare beneficiaries between approximately November and December 2022 as described in paragraphs 26 - 28.

41.     During that time period, there is little evidence of payment for the regular and sizeable expenses that one would expect for a business operating as a large scale provider of OTC COVID-19 test kits to Medicare beneficiaries, such as for payroll (or to a payroll service provider); for COVID-19 test kits; for shipping, postage, or packaging; or payments to Medicare billers, from financial accounts that the government has identified associated with SK Diagnostics.

42.     According to information provided by Medicare, as of June 7, 2023, Medicare had paid more than $43 million to SK Diagnostics through SK Account 1 and SK Account 2.

### v. Tracing $1,500,000 fraudulently obtained from Medicare by SK Diagnostics to the Wintrust Account.

43. On or about May 5, 2023, according to records from Bank of America, $1,500,000 was wire transferred from Bank of America account x4571, maintained in the name of Alex & Ali, to the **Wintrust Account**.

44. The $1,500,000 wire transferred from Alex & Ali account x4571 to the **Subject Account** were derived from fraudulent billing by SK Diagnostics for purported delivery of OTC COVID-19 test kits.

a) According to records obtained from Bank of America, Alex & Ali account x4571 was opened on or about April 5, 2023, by Syed Hyder Hussain, the same individual who – according to Bank of America records – opened SK Account 2.

b) Syed Hyder Hussain was also the President and registered agent of SK Diagnostics at this time.

c) Prior to the May 5, 2023, wire transfer of $1,500,000 to the **Wintrust Account**, between approximately April 26, 2023, and May 3, 2023, funds totaling approximately $2,405,000 were transferred into Alex & Ali account x4571 from SK Account 2 on the dates and in the amounts set forth below:

| Date | Amount |
|------|--------|
| 04/26/2023 | $5,000.00 |
| 04/26/2023 | $1,500,000.00 |
| 05/02/2023 | $700,000.00 |
| 05/03/2023 | $200,000.00 |

d) Prior to the transfer of those funds to Alex & Ali account x4571 – that is, between approximately April 20, 2023, and April 25, 2023 – SK Account 2

11

received 3 wire transfers from SK Account 1 in amounts totaling $2,703,859.20, on the dates and in the amounts set forth below:

| Date | Amount |
|------|--------|
| 04/20/2023 | $951,054.72 |
| 04/25/2023 | $1,271,679.36 |
| 04/25/2023 | $481,125.12 |

e)      The $2,703,859.20 transferred to SK Account 2 were payments made by Medicare between approximately April 19, 2023, and April 24, 2023, to SK Account 1 for billing by SK Diagnostics for purported delivery of OTC COVID-19 test kits. The dates and amounts in which SK Account 1 received those funds from Medicare are set forth below:

| Date | Amount |
|------|--------|
| 04/19/2023 | $951,054.72 |
| 04/21/2023 | $1,271,679.36 |
| 04/24/2023 | $481,125.12 |

45.     The flow of funds from Medicare through SK Account 1, SK Account 2, and Alex & Ali account x4571 to the **Wintrust Account** is further summarized below:

| Date | Amount | Description |
|------|--------|-------------|
| 04/19/23 - 04/24/23 | $2,703,859.20 | 3 Medicare payments to SK Account 1 |
| 04/20/23 - 04/25/23 | $2,703,859.20 | 3 wire transfers from SK Account 1 to SK Account 2 |
| 04/26/23 - 05/03/23 | $2,405,000.00 | 4 transfers from SK Account 2 to Alex & Ali account |
| 05/05/23 | $1,500,000.00 | Alex & Ali account to the **Subject Account** |

46.     The government interviewed Syed Hyder Hussain on June 27, 2023, concerning his knowledge of the business of SK Diagnostics.

47.     After the interview, on June 27, 2023, Hussain departed the United States from O'Hare International Airport aboard an Etihad Airways flight bound

for Abu Dhabi, United Arab Emirates. Travel records indicate that Hussain purchased his ticket on June 27, 2023.

**B.     Luna Labs**

48.     According to Illinois Secretary of State records, Luna Labs was incorporated on or about January 17, 2022.

49.     At the time of its organization, Individual RP was listed as the "Registered Agent." Six individuals were identified as its managers.

50.     Luna Labs directed Medicare to pay it through deposit of funds into JPMC account xxxxx6715 ("Luna Account 1") beginning on approximately July 4, 2022.

51.     In or about February 2023, Baqar Hussain Razv Syed ("Syed") became the nominee owner of Luna Labs.

52.     On or about March 3, 2023, Articles of Amendment were filed for Luna Labs with the Illinois Secretary of State's office to admit a new manager, Baqar Hussain Razv Syed, and withdraw all six of its initial managers.

53.     According to Illinois Secretary of State records, Health Care Management & Marketing LLC ("HCMM") was incorporated on or about April 1, 2023. Syed was the "registered agent" and "manager" of HCMM.

54.     On or about April 3, 2023, Syed opened an account in the name of HCMM at JPMC account xxxxx7536 ("Luna Account 2").

### i. Medicare claims analysis

55. Medicare claims data for the week of June 20, 2023, indicated that between March 7, 2023, and June 9, 2023, a period of only about 13 weeks, Luna Labs billed approximately $69,832,800 to Medicare for HCPCS Code K1034.

56. Those claims were based upon purported delivery of OTC COVID-19 tests to approximately 347,164 Medicare beneficiaries. The dates of service for the claims were between approximately February 27, 2023, and May 11, 2023.

57. Prior to March 7, 2023, Luna Labs had never billed for HCPCS K1034.

58. Luna Labs billing for OTC COVID-19 tests began just four days after Syed became its sole "manager."

59. Luna Labs' approximate monthly billing to Medicare for delivery of OTC COVID-19 tests for March 2023 through May 2023 is provided in the chart below:

| Month of submission | No. of claims | Purported no. of OTC kits | Billed amount | Paid amount |
|---|---|---|---|---|
| March | 24,247 | 193,976 | $4,849,400 | $2,235,387 |
| April | 111,420 | 891,360 | $22,284,000 | $10,162,897 |
| May | 213,419 | 1,707,352 | $42,683,800 | $19,075,660 |

60. On the basis of these claims, Medicare transmitted more than $14 million to Luna Account 1.

61. An extraordinary spike in billing over a limited time period is uncommon and indicative of fraudulent activity.

### ii. Medicare beneficiary complaints

62.     Since approximately March 2023, shortly after Luna Labs began submitting claims to Medicare for HCPCS Code K1034, Medicare beneficiaries have submitted an extraordinary number of complaints to the government relating to Luna Labs.

63.     Between approximately March 15, 2023, and June 14, 2024, Medicare received 26,269 complaints from Medicare beneficiaries regarding Luna Labs.

64.     Although investigators have not yet interviewed all of the beneficiaries, the complaints have been preliminarily reviewed and categorized by the government.

65.     11,815 of the complaints have been categorized as "Did Not Receive Services," and 828 of the complaints have been categorized as "Suspected Identity Theft."

66.     Law enforcement agents have begun to interview Medicare beneficiaries who have lodged complaints relating to Luna Labs.

67.     For example, between June 14, 2023, and June 15, 2023, law enforcement agents interviewed four individuals who reported that Luna Labs had billed Medicare using his/her name for shipment of OTC COVID-19 test kits that were purportedly delivered to them. All four individuals reported to the interviewing agent that they either did not receive or did not request an OTC COVID-19 test kit from Luna Labs.

15

### iii.    Billing for deceased beneficiaries

68.    As of approximately June 5, 2023, Luna Labs attempted to bill Medicare for approximately 744 deceased beneficiaries. In other words, the date of service according to the claim submitted by Luna Labs, purportedly the date the test kits were sent or delivered, occurred after the reported death of the Medicare beneficiary.

69.    For example, Luna Labs submitted a claim under procedure code K1034 with a purported date of service of April 26, 2023, for a test kit allegedly delivered to Medicare beneficiary J.B. According to Medicare data, however, Medicare beneficiary J.B. died on October 21, 2018.

70.    As another example, Luna Labs submitted a claim under procedure code K1034 with a purported date of service of April 26, 2023, for a test kit allegedly delivered to Medicare beneficiary J.W. According to Medicare data, however, Medicare beneficiary J.W. died on January 12, 2019.

71.    Medicare providers who repeatedly bill for services purportedly delivered to dead beneficiaries are often using Medicare beneficiary information that has been purchased or unlawfully transferred, rather than collected in the ordinary course of the provision of bona fide services to beneficiaries.

### iv.    Lack of identifiable business expenses

72.    Based upon review of bank records for Luna Labs and other financial records, there is no indication that Luna Labs had business expenses that one would expect for a company that delivered millions of OTC COVID-19 test kits to

16

hundreds of thousands of Medicare beneficiaries between approximately February 27, 2023, and May 11, 2023, as described in paragraphs 55 - 59.

73.     During that time period, there is no evidence of payment for the regular and sizeable expenses that one would expect for a business operating as a large scale provider of OTC COVID-19 test kits to Medicare beneficiaries, such as for payroll (or to a payroll service provider); for COVID-19 test kits; for shipping, postage, or packaging; or payments to Medicare billers, from financial accounts that the government has associated with Luna Labs.

### v.     Guilty plea of Syed

74.     On December 1, 2023, Syed was charged in the Northern District of Illinois (case no. 23 CR 385) with participating in a scheme to defraud Medicare in connection with billing by Luna Labs for purported delivery of OTC COVID-19 test kits, in violation of Title 18, United States Code, Section 1347.

75.     On April 16, 2024, Syed pled guilty to the charge. In summary, in his plea agreement, Syed admitted, among other things, that:

a)     he acted as the nominee owner of Luna Labs from approximately February 2023 through July 2023 so that fraudulent claims could be submitted to Medicare on behalf of Luna Labs by co-schemers;

b)     At the direction of others, Syed incorporated HCMM, and opened several bank accounts associated with it;

c)     upon receipt of funds from Medicare, he distributed the funds to other accounts he controlled at the direction of co-schemers.

### vi. Tracing $3,000,000 fraudulently obtained from Medicare by Luna Labs to the Wintrust Account.

76.     As noted above in paragraph 54, Syed opened Luna Account 2 on or about April 3, 2023.

77.     On or about May 9, 2023, according to records from JPMC, $3,000,000 were wire transferred from Luna Account 2 to the **Wintrust Account**.

78.     The $3,000,000 wire transferred to the **Wintrust Account** were derived from fraudulent billing by Luna Labs for purported delivery of OTC COVID-19 test kits.

79.     More specifically, records obtained from JPMC demonstrate that between April 10, 2023, and May 8, 2023, funds totaling approximately $6,395,000 were transferred into Luna Account 2 from Luna Account 1.

80.     During the period when those funds were transferred from Luna Account 1 to Luna Account 2, the only deposits into Luna Account 1 were funds paid by Medicare to Luna Labs, which totaled approximately $7,387,820. Those funds were paid by Medicare to Luna Labs for purported delivery of OTC COVID-19 test kits to Medicare beneficiaries.

### C.     **The Wintrust Account**

81.     The **Wintrust Account**, maintained in the name Himont Law Group, Ltd., Client Trust Fund Account, was opened at Wintrust Bank on or about May 1, 2023. Al Haroon Husain ("Husain") was the sole signer on the **Wintrust Account**. The account address was identified as 7301 North Lincoln Avenue, Ste. 180, Lincolnwood, Illinois.

82.     According to the Illinois Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois ("ARDC"), Al-Haroon Bin Asad Husain is a licensed attorney in the State of Illinois. Himont Law Group Ltd., 7301 N. Lincoln Avenue, Ste. 180, Lincolnwood, Illinois, is the registered address for Husain according to the ARDC's website.

83.     Approximately four days after the **Wintrust Account** was opened, on or about May 5, 2023, $1,500,000 was wire transferred from Alex & Ali account x4571 to the **Wintrust Account**.

84.     The next deposit into the **Wintrust Account**, on May 9, 2023, was $3,000,000, which was wire transferred from Luna Account 2.

85.     As described above, the $4,500,000 wire transferred into the **Wintrust Account** were obtained fraudulently from Medicare.

86.     After the $4,500,000 were transferred to the **Wintrust Account**, due to suspicion that money laundering might be occurring, Wintrust Bank placed a restriction on the **Wintrust Account**.

87.     After the funds were received by Wintrust Bank, Husain told a Wintrust Bank employee he intended to transfer the majority of the $4,500,000 to the United Arab Emirates for property investments. Husain also said he wanted to buy property on the north side of Chicago.

88.     A Wintrust Bank fraud investigator (the "Fraud Investigator") later spoke to Husain, who explained that he was an attorney who represented clients and conducted large transactions overseas.

89.     Husain offered to send the Fraud Investigator copies of Bank of America and Chase bank statements to demonstrate the legitimacy of the transactions. The Fraud Investigator reviewed the statements sent by Husain and concluded that Medicare fraud was occurring.

90.     For a time, Husain sent frequent emails to the Fraud Investigator asking for updates on the **Wintrust Account's** status. At one point, Husain told the Fraud Investigator there were meetings being set up overseas and they needed the money being held by Wintrust Bank.

91.     On or about May 15, 2023, Husain sent an email to the Fraud Investigator stating, "I had my clients go to their bank work with them to clear things out. [sic] I was told Bank of America was ok. Have not heard from Chase yet."

92.     At some point, Husain's tone changed. Husain told the Fraud Investigator that if there was anything wrong with the money, Husain didn't want it.

93.     For example, according to records obtained from Wintrust Bank, on May 18, 2023, Husain emailed the Fraud Investigator and asked, "its [sic] been a week since I made the transfer. anything [sic] new?"

94.     The Fraud Investigator replied the same day, stating, "The investigation into this matter is active and ongoing, as of the moment we do not have anything new to report. You had mentioned in a previous conversation that

returning the two wire transfer deposits received from Chase and Bank of America would be an option to consider. Is this something you would like to proceed with?"

95.     Husain replied by email the same day, stating, "If this will unfreeze my accounts then yes please. If there is an issue with the funds I don't want them in my account."

96.     Husain did not, however, make any attempt to return the funds to Bank of America or JPMC.

97.     The defendant property was seized on or about March 6, 2024, from the **Wintrust Account**, and is currently in the custody of the United States Marshals Service.

## Conclusion

98.     For the reasons stated herein and in the attached affidavit, incorporated by reference herein, the foregoing defendant property is subject to forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 and 1957, or any property traceable to such property. The defendant property is further subject to forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), as property that constitutes and is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1341, 1343, 1347, and 1349.

WHEREFORE, based upon the aforementioned facts and circumstances, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. Supp. G(3)(b), respectfully, prays:

1)      That process issue for an arrest warrant *in rem* for the defendant property, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

2)      That due notice be given to all parties to appear and show cause why forfeiture of the defendant property to the United States in accordance with the claims herein set forth should not be decreed;

3)      That this Court enter a judgment of forfeiture for the defendant property to the United States; and

4)      That this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney
Northern District of Illinois

By:     _/s/  Brian Hayes_____
BRIAN HAYES
Assistant United States Attorney
219 South Dearborn., Rm. 500
Chicago, Illinois 60604
(312) 353-5300

Dated: July 5, 2024

NORTHERN DISTRIT OF ILLINOIS )
                            )      SS:
COUNTY OF COOK          )

<u>AFFIDAVIT</u>

I, KARL D. KRAYWINKLE, being duly sworn, upon oath, depose and state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since April 2011.

2.      My duties and responsibilities as an FBI Special Agent include conducting criminal investigations of individuals and organizations that have violated federal laws, including violations of Title 18, United States Code, Sections 1343 (wire fraud), 1347 (health care fraud), and Title 18, United States Code, Sections 1956 and 1957 (money laundering). I have received specialized training and participated in numerous health care fraud investigations. I have participated in the execution of multiple federal search warrants, seizure warrants, and arrests.

3.      I have read the complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief based upon my own personal knowledge as well as information I have received from other agents, persons and documents, and it does not include each and every fact known to me concerning this investigation.

4.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _07/03/2024_

_____
KARL D. KRAYWINKLE, Special Agent
Federal Bureau of Investigation